**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **KENNETH FREELING** | * | |
| **940 25th Street, N.W.** | * | |
| **Washington, D.C. 20037** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No. _____** |
| | * | |
| **BARCLAYS BANK PLC** | * | |
| **1 Churchill Place** | * | |
| **Canary Wharf, London** | * | **JURY TRIAL DEMANDED** |
| **E14 5HP** | * | |
| | * | |
| **Serve:** | * | |
| | * | |
| **by hand** | * | |
| **Barclays Capital, Inc.** | * | |
| **c/o Registered Agent** | * | |
| **CT Corporation System** | * | |
| **1015 15th Street, N.W.** | * | |
| **Suite 1100** | * | |
| **Washington, D.C. 20005** | * | |
| | * | |
| **by certified mail, return receipt** | * | |
| **Chief Operating Officer** | * | |
| **Barclays Bank, PLC** | * | |
| **745 Seventh Avenue** | * | |
| **New York, New York 10019** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

(Declaratory Judgment; Negligent Misrepresentation; Intentional Misrepresentation; Rescission)

Plaintiff, Kenneth Freeling, Esq. ("Mr. Freeling"), by his counsel, Rifkin, Weiner,

Livingston, Levitan & Silver, LLC, Charles S. Fax, Esq., and Liesel J. Schopler, Esq., for his

Complaint against Barclays Bank, PLC ("Barclays"), states as follows:

A.    <u>**Nature of the Action**</u>

1.    Mr. Freeling is a former equity partner in the now bankrupt and defunct law firm Dewey & LeBoeuf LLP ("Dewey").   Barclays was Dewey's bank.   Mr. Freeling seeks a Declaratory Judgment that a purported contract which Barclays claims was executed between the bank and Mr. Freeling in Washington, D.C. – for an ostensible loan in the amount of $331,849.00, but which in fact was never formed – is a nullity, and void *ab initio*, for want of acceptance under its clear and unambiguous terms.   In the alternative, if the Court finds that an agreement was reached, Mr. Freeling seeks damages against Barclays for negligent misrepresentation, fraudulent concealment and fraudulent inducement or, in the alternative, prays for rescission.

B.    <u>**Parties**</u>

2.    Mr. Freeling is an attorney-at-law licensed in the District of Columbia, currently practicing law in this jurisdiction.   He concentrates in antitrust and patent matters and complex commercial litigation.   Mr. Freeling is a *magna cum laude* graduate of Georgetown University and Georgetown University Law Center.   He is a citizen of the District of Columbia, domiciled at 940 25th Street, Washington, D.C. 20037.

3.    Mr. Freeling joined the law firm then known as Dewey Ballantine LLP as an equity partner, resident in its Washington, D.C. office, in or about June 2007.   Shortly thereafter he learned that Dewey was in merger talks with LeBoeuf Lamb Green & MacRae LLP ("LeBoeuf").   The merger was announced in August 2007.   Mr. Freeling, based in Washington, D.C., was an equity partner in the merged firm, Dewey & LeBoeuf LLP ("Dewey"), from its inception until his resignation from the firm in January 2011.

2

4.     Barclays is a public limited company incorporated in England and Wales, engaged in the business of banking.  Barclays, directly and/or through its subsidiaries and affiliates, does a considerable amount of business in the District of Columbia, and maintains a branch office for investment and banking services, denominated "Barclays Wealth," managed by "Barclays Capital, Inc." at 2001 K Street, N.W., Washington, D.C. 20006.

**C.     Jurisdiction and Venue**

5.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332(a)(2), there being complete diversity of citizenship between the parties, and the amount in controversy exceeding the sum or value of $75,000.00, exclusive of interest and costs.

6.     This Court has personal jurisdiction over Barclays under the District of Columbia Long Arm Statute, D.C. Code Ann., § 13-423(a)(1), inasmuch as the claim stated herein arose out of Barclays's conduct in the District of Columbia, namely, its delivery of the subject loan documents to Mr. Freeling for his signature in the District of Columbia, and his signing of the same in the District of Columbia.  In addition to the Court's specific personal jurisdiction over the matter as averred in this Complaint, this Court has personal jurisdiction over Barclays by virtue of its ongoing, continuous and extensive business conducted directly, and/or through subsidiaries and affiliates, in the District of Columbia, including its maintenance of a branch office, denominated "Barclays Wealth," managed by "Barclays Capital," offering investment and banking services in the District of Columbia, at 2001 K Street, N.W., Washington, D.C. 2006.

7.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(b) and (c).

**D.**     **Facts**

<u>The Offering Letter</u>

8.     As alleged hereinabove at Paragraph 3, Mr. Freeling joined the law firm then known as Dewey Ballantine LLP ("Dewey Ballantine") as an equity partner in or about June 2007.  Shortly thereafter he learned that Dewey Ballantine was in merger talks with LeBoeuf Lamb Green & MacRae LLP ("LeBoeuf").  The merger was announced in August 2007, to be effective October 1, 2007.

9.     In or about September 2007, shortly before the effective date of the merger, Barclays, on behalf of Dewey Ballantine, circulated an offer to its partners to finance their firm capital contribution requirements through a subscription loan program with Barclays (the "Offer").  The Offer was composed of an Offering Letter, an Instruction Letter ("Schedule A") and an unsigned Partnership Undertaking ("Schedule B").  The Offering Letter (as addressed to Mr. Freeling, dated September 11, 2007) and Schedules A and B are attached hereto as collective **Exhibit 1**.

10.     The Offering Letter stated that under its terms, the Borrower "appoint[ed] as its agent, and grant[ed] power of attorney, to [the finance partner] from time to time of the Firm [the "Agent") to sign all documents and do all acts on the Borrower's behalf in connection with drawing the Loan, paying interest on the Loan and repaying the Loan." Exh. 1, ¶ 7.

11.     The Offering Letter also clearly and unambiguously stated the terms of acceptance:

> Acceptance by the Borrower of the Loan on the terms and
> conditions stated herein will be signified by the Borrower signing
> the attached copy of this letter and returning it, together with the

> Instruction Letter, duly executed, and the Undertaking, duly signed
> by authorized partners of the Firm, to the Bank.

Exh. 1, ¶ 13.

12.     The significance of ¶ 13 of the Offering Letter was reinforced by the language in

¶¶s 2 and 3.1.  Paragraph 2 recited: "This offer will be available to the Borrower for acceptance

for a period of two calendar months from the date of this letter, after which date the offer will

lapse.  *Acceptance will be signified by completion of the formalities in clause 13*."  (Italics

added.)  Paragraph 3.1 recited, *inter alia*: "Following completion of the matters detailed in clause

8 *and the acceptance formalities detailed in clause 13*, the Loan will be available for drawing in

a single amount . . ."  (Italics added.)

13.     The Instruction Letter provided, *inter alia*:

> In order for the Bank to authorize such borrowings the Bank
> requires that the Firm issue a Letter of Undertaking under which,
> *inter alia*, the Firm will undertake to pay any funds withdrawn at
> any time (and from time to time) on or after the date hereof from
> my partnership capital account with the Firm (the "Capital
> Account") directly to the Bank for application in or towards
> repayment of such borrowings to the extent necessary to repay
> such borrowings and to ensure that the outstanding balance of such
> borrowings shall not at any time exceed the balance of the Capital
> Account.

Exh. 1, Schedule A.

14.     The Partnership Undertaking provided, *inter alia*, that in connection with each

loan,

> [P]rovided that the instruction Letter remains in force, we [the
> Dewey Partnership] irrevocably undertake that upon the earliest of:
> (a) the Partner ceasing to be a Partner in the Firm, (b) the
> occurrence of any event of default under the Facility Letter, and (c)
> the making or docketing of judgment in England or New York
> against the Partner in respect of amounts due under the Facility
> Letter, we will apply the balance of the Partner's Capital Account
> in satisfying (so far as is possible) any indebtedness remaining

5

> outstanding under the loan with the Bank, before paying any residue to the Partner or to the Partner's legal personal representatives.

Exh. 1, Schedule B.

15.     Significantly, the Offering Letter contained an integration clause, as follows:

> This Letter, the Instruction Letter and the Undertaking contain the entire agreement between the parties with respect to the transactions contemplated hereby, and supersedes all written and oral negotiations, representations, warranties and other understandings prior to the date hereof, except as expressly confirmed or provided herein.  The terms of this facility letter may not be amended except in writing.

Exh. 1, ¶ 15.

16.     In addition to being clear and unambiguous in and of itself, through operation of the ¶ 15 integration clause, ¶ 13 established the only method of acceptance of the Offering Letter's terms and conditions, except through written amendment of the Offering Letter itself: No alternative methods of acceptance were provided in the loan documentation; to the contrary, the loan documentation requires strict adherence to ¶ 13 throughout.  Further, the integration clause established that there could be no variance from the requirement in the Instruction Letter that Dewey, through two of its authorized partners, would undertake to repay to the Bank any funds withdrawn from Mr. Freeling's capital account (as, for example, upon his resignation from Dewey) for application toward repayment of his loan as a condition precedent to the loan agreement.

17.     At no time did Barclays request any financial information from Mr. Freeling to ascertain his creditworthiness for the loan.   In fact, from the start of the Dewey Ballantine/Barclays loan program, through its duration, the bank looked only to Dewey

Ballantine's creditworthiness to support the loan, and not to the creditworthiness of the individual partners, including Mr. Freeling.

18.     The Offering Letter and its attachments were all drafted by Barclays: Mr. Freeling did not negotiate with Barclays or anyone else over any of the language or terms in these documents.

19.     Mr. Freeling did not respond to the Offer.

<u>Joel Sanders' Representations, Assurances and Commitment</u>

20.     In early October 2007, Mr. Freeling, while in his office in Washington, D.C., received a telephone call from Joel Sanders ("Mr. Sanders"), who had been Chief Financial Officer ("CFO") of LeBoeuf, and was promoted to CFO of the merged firm, Dewey.   (Mr. Sanders, together with the Firm's Chairman and Executive Director, was a criminal defendant in a trial in the Supreme Court of New York County for alleged accounting fraud as part of a scheme to conceal the truth about Dewey's perilous financial condition in the months leading to the firm's collapse in 2012.)

21.     At the outset of the call, Mr. Sanders identified himself as the new CFO of Dewey.  He advised Mr. Freeling that completing the Barclays subscription was a high priority for the newly merged firm; many partners had already submitted their signed subscription requests; and he urgently needed to determine the number of probable participants who would do so.  Mr. Freeling responded that he was new to Dewey Ballantine, had been engaged in trial proceedings in another state since he joined, was unfamiliar with the program or any partner capital requirements, had not reviewed the loan documents and did not have them at hand, and did not know whether the merger had been completed.  Mr. Sanders, pressing, said that he would

have another set of documents delivered to Mr. Freeling's office and follow up later that day so that Mr. Freeling "would not be holding up the works."

22.     Mr. Sanders called again later that day as he said he would.  Mr. Freeling told Mr. Sanders that he had many questions, including questions about partner capital obligations with respect to Dewey Ballantine and the newly merged firm; the Barclays program; who was participating and alternatives; Barclays's existing relationship with the old firm and the newly merged one; the maintenance of capital accounts and the security of his capital; the identity of the finance partner who would be acting as Mr. Freeling's agent with power of attorney under the terms of the Offer Letter and his availability to speak with Mr. Freeling about the program; the terms of the Letter of Undertaking and the protections it would afford him if he agreed to it; the identities of two partners who would be authorized by the firm to execute the Undertaking, which was critically important to Mr. Freeling and on which he would be relying if he were to agree to participate in the program; which firm these partners were authorized to bind and whether they had the authority of the firm that had merged or would be merging; their availability to speak to him; and numerous other details about the program, partners' capital, and capital accounts, and the program.

23.     Mr. Sanders said that many other partners were raising similar questions, which would be addressed as soon as possible, and that once the terms of the program were finalized, an information session would be organized to address these questions and make available the authorized partners and a Barclays representative.

24.     Mr. Sanders further advised Mr. Freeling that the authorized partners had not been designated yet but that Mr. Sanders would tell Mr. Freeling as soon as they were.  Mr. Sanders explained that he needed signature pages from partners who were willing to participate in order

to further process the subscription, but he assured Mr. Freeling that the entire subscription package would be returned to him after he signed and after the Partnership Undertaking was executed, because Mr. Freeling was required to submit the subscription himself to Barclays, certifying his acceptance of its terms.  Mr. Sanders repeated that under no circumstances would Dewey return the subscription to Barclays, thus giving Mr. Freeling the option of not accepting the Offer until all of his questions were answered to his satisfaction, and he had submitted his acceptance to Barclays directly.  Mr. Sanders also assured Mr. Freeling that Barclays knew and understood that the completed loan package had to be submitted by Mr. Freeling personally so that there was no risk to Mr. Freeling.

25.     On the basis of, and in reliance on, those representations, Mr. Freeling signed the Offering Letter (Exh. 1) and the Instruction Letter (Exh. 1, Schedule A) in his office in the District of Columbia and returned the subscription to Mr. Sanders in New York.

26.     Neither Mr. Sanders nor anyone else at Dewey other than Mr. Freeling himself was authorized to submit the loan documentation to Barclays, nor could Barclays, under the clear and unambiguous terms of its offer, complete the formation of a loan agreement with Mr. Freeling by accepting the loan documents from anyone other than Mr. Freeling directly.

<u>Mr. Freeling's Resignation and Exit From the Firm</u>

27.     Between then and the time that he resigned from Dewey, more than 2 years later, Mr. Freeling heard nothing further about the potential loan; never received any further communications from Mr. Sanders in that regard; never was advised of the identity of the Agent or the authorized partners for purposes of Dewey's undertaking, so that he could discuss the terms with a knowledgeable person; never received the completed package for review, final

9

approval and transmittal to Barclays, or alternatively, rejection of the Offer; and never heard from Barclays.

28.     Mr. Freeling resigned his Dewey partnership in January 2011.  The financial and logistical details of his exit were managed by Steven DiCarmine ("Mr. DiCarmine"), Dewey's Executive Director, and Frank Canellas ("Canellas"), its Controller. (DiCarmine was a co-defendant with Mr. Sanders in the criminal prosecution referenced above.  Mr. Canellas pleaded guilty to grand larceny testified against Mr. Sanders and Mr. DiCarmine in the trial.)

29.     In reviewing with Mr. Freeling the financial matters related to his exit, Mr. DiCarmine brought up a Barclays loan purportedly in Mr. Freeling's name and said that it would be repaid by the Firm and that "Frank" (Canellas) would be taking care of it.  Mr. Freeling recounted the substance of his prior communications with Mr. Sanders, advised that he had never heard anything further, had never been advised of the names of the authorized partners with whom he could discuss the terms of the Offer, and stated that to his knowledge the subscription had never been completed, much less returned to him for final consideration and submission or rejection.  Mr. Freeling said that he had never accepted the Offer in accordance with the terms specified by Mr. Sanders and in the documents themselves.  As far as Mr. Freeling knew, Dewey had either funded his account, taken responsibility for funding it, or never funded it.  Mr. DiCarmine did not dispute any of Mr. Freeling's statements.

<u>Barclays Contacts Mr. Freeling For the First Time</u>

30.     Mr. Freeling heard nothing more about the matter until May 2012, almost 1½ years after his resignation from Dewey.  In May 2012, he received a letter from Barclays that had been forwarded to him.  The letter was signed by Mr. Andrew Johnman ("Johnman") of Barclays advising that it had called the loan.  Mr. Freeling telephoned Johnman to inquire, and asked that

he send Mr. Freeling copies of the pertinent documents.  Johnman sent the package identified herein as Exh. 1.

31.     After reviewing the documents, Mr. Freeling telephoned Johnman again.  He told Johnman that he had never before seen the signed Partnership Undertaking, which was executed weeks after Mr. Freeling had signed the Offering Letter and the Instruction Letter.  Mr. Freeling observed that the Offering Letter expressly required that the Partnership Undertaking be executed by two authorized partners – and that he relied on that representation – but that the letter was not executed by two authorized partners.  On information and belief Canellas was one of the signatories and Peter Casey, another non-lawyer administrative employee based in Dewey's London office and who was a stranger to Mr. Freeling, was the other.  Notably, the designation "partner" had been crossed out beneath each of their signatures, presumably by them.  On further information and belief, Dewey never appointed two authorized partners, and Barclays knew that.  Further, as to the Offering Letter itself, Mr. Freeling noted that an ostensible "witness" to his signature had signed as "witness" beneath Mr. Freeling's name, but that in fact, no one had witnessed his signature – the "witness" had added his own signature at some later point, misrepresenting the fact that he had witnessed Mr. Freeling sign the Offering Letter.

32.     Mr. Freeling told Johnman that the failure of authorized partners to execute the Partnership Undertaking – a condition precedent to the agreement – and Barclays's obvious knowledge of that (as the title "partner" had been crossed out), meant that there was no agreement.  Further, contrary to Mr. Sanders's assurances to Mr. Freeling, Dewey had submitted the agreement on its own, without Mr. Freeling's knowledge or consent.

33.     Mr. Freeling also pointed out that even if an agreement had been formed – which it had not – it was inoperative because, to his knowledge, no Dewey finance partner had been

appointed as agent with power of attorney to authorize any draw-downs or perform any other act on Mr. Freeling's behalf.  Mr. Freeling said that he had many other concerns but requested responses from Barclays on these points before discussing the matter further.

34.     Johnman advised that he would convey Mr. Freeling's information internally and get back to him.  Johnson never did.

35.     Mr. Freeling heard nothing further for more than three years.  Then, on August 13, 2015, he received an email from Oliver Rawkins, purportedly on behalf of Barclays. Rawkins's email copied Richard Clayton ("Clayton"), a British solicitor who is a partner in the British law firm Addleshaw Goddard.  The email referenced the "loan agreement with Barclays Bank plc," and advised that the bank had correspondence for Mr. Freeling "regarding [his] liabilities under the loan agreement."  On September 25, 2015, Addleshaw Goddard, on behalf of Barclays, sent a letter to Mr. Freeling at his office in Washington, D.C., demanding payment of the "current Loan Principal Balance" in the amount of $331,849.00, and interest (through September 14, 2015) in the amount of $29,173.92, for a total of $361,022.92.   Addleshaw Goddard threatened to bring suit against Mr. Freeling if the alleged debt was not repaid in full.

<u>Dewey's Defalcations And Defaults</u>

36.     Since Dewey's bankruptcy filing in 2012, it has come to light that Dewey had been in default to Barclays for years with respect to its obligation to return to return capital to Barclays when Dewey partners left the firm.  Scores of Dewey partners with Barclays's capital loans withdrew from Dewey in the years preceding the May 2012 Dewey bankruptcy, including at least 23 Dewey Ballantine partners with Barclays's capital loans who withdrew from Dewey Ballantine in 2006, the year before its merger with LeBoeuf.

37.     As partners departed Dewey (and before that, Dewey Ballantine) with Barclays's loans outstanding, Dewey (and before that, Dewey Ballantine) was required under the documentation described above to pay back the Barclays's capital loan amounts upon the earliest of the partner ceasing to be a partner of the firm, the occurrence of an event of default under the terms of the loan, and the entry of judgment in England or New York against the partner regarding amounts due under  Partnership Undertakings.

38.     But the firm did not do so.  In fact, as early as December 2006, only nine months after the inception of the Dewey Ballantine capital loan program with Barclays, Dewey Ballantine had already failed to pay back to Barclays partners' capital related to at least eight partners due and owing to Barclays in an aggregate amount of, at a minimum, just under $750,000.  In fact, the number is likely much higher, as 23 departed Dewey Ballantine partners, and 91 then-partners, had capital loans with Barclays as of April 15, 2007.

39.      Up to the time that it declared bankruptcy in May 2012, Dewey continued to fail to repay Barclays in the aggregate millions of dollars owed to the bank from departed and other partners' capital accounts pursuant to the respective undertaking provided by the firm to Barclays.  This constituted an ongoing, and burgeoning, default of Barclays's obligations pursuant to its undertaking.

40.     Barclays knew full well that the Dewey partners to whom they were lending capital as part of the Barclays Program, including Mr. Freeling, did not know this crucial and material information.  Barclays knew that the fact that Dewey had failed to pay back to Barclays departed and other partners' capital in material amounts was nowhere disclosed in Dewey's financial statements, as it should have been.

41.     Barclays failed to advise Mr. Freeling or other Dewey partners, at the time that they signed their loan agreements, that Dewey had already defaulted under the respective undertakings between the firm and Barclays by failing to repay the amounts due to the bank.

42.     Barclay had a duty to disclose such material information to Mr. Freeling arising out of its special relationship with Dewey and its partners, as well as Barclays's superior knowledge of the illusory nature of the Partnership Undertaking, upon which Barclays knew or should have known that Mr. Freeling was relying in agreeing to sign the Offering Letter. Barclays knew or should have known that such information would have affected Mr. Freeling's assessment of the risks associated with signing any loan agreement, and would have dissuaded him from doing so, as the security provided to him by the Partnership Undertaking was meaningless.

43.     Barclays's conduct in failing to disclose to Mr. Freeling these material facts was either willful or negligent.

**E.      Claims for Relief**

<u>**COUNT ONE**</u>
(Declaratory Judgment)

44.     Mr. Freeling incorporates by reference Paragraphs 1-43, as though fully stated herein.

45.     The Offering Letter established, as a condition precedent to the existence of an agreement, that two authorized partners of Dewey execute a Partnership Undertaking on behalf of the firm, upon which condition precedent Mr. Freeling relied.

46.     Two authorized partners of Dewey did not execute the Partnership Undertaking. To the contrary, on information and belief, Dewey's controller, Mr. Canellas, and Mr. Casey, a London based administrative employee of Dewey, neither of whom were lawyers, did so.

47.     Accordingly, no loan agreement ever came into existence.  Indeed, Mr. Freeling had been assured by Mr. Sanders that the completed loan documents would be returned to Mr. Freeling for final consideration and submission to Barclays – after execution of the Partnership Undertaking by two authorized partners.  When that did not happen, Mr. Freeling reasonably concluded that the loan program had been abandoned.  Indeed, after returning the signed Offering Letter and Instruction Letter to Mr. Sanders in October 2007, Mr. Freeling did not hear about the loan again until he resigned from the firm in January 2010 – more than 2 years later. And it was not until 2015, more than eight years after signing the Offering Letter, that Mr. Freeling first saw the fully executed documents, and learned that two authorized partners had not signed the Partnership Undertaking – consistent with Mr. Freeling's reasonable understanding that the agreement had never been consummated.

48.     Barclays, however, maintains that the loan agreement is valid and enforceable, has demanded repayment from Mr. Freeling, and, through counsel, has threatened to sue Mr. Freeling if he does not pay the full amount allegedly owed.

49.     Thus there exists an actual and justiciable controversy between Mr. Freeling and Barclays regarding the existence and enforceability of the loan agreement memorialized in the Offering Letter and Schedules A and B thereto (Exh. 1 hereto), as to which Mr. Freeling is entitled to a declaratory judgment.

50.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Mr. Freeling prays that the Court declare his rights regarding same, and enter final judgment thereon.

51.     Specifically, Mr. Freeling prays for entry of judgment declaring and adjudicating that no loan agreement, as embodied in the Offering Letter and Schedules A and B thereto (Exh.

1 hereto) was formed between himself and Barclays, that none exists, and that he is not obligated thereon.

## COUNT TWO
(Negligent Misrepresentation)

52.     Mr. Freeling incorporates by reference Paragraphs 1-43, as though fully stated herein.

53.     Barclays owed a duty of care to Mr. Freeling, in tendering the Offering Letter and Schedules A and B (Exh. 1 hereto) to him, to represent truthfully the terms of the prospective loan.  In addition, Barclays owed a duty of care not to conceal material facts from Mr. Freeling regarding the real terms of the loan, as opposed to the ostensible terms of the loan as reflected in the written instrument.

54.     Barclays misrepresented to Mr. Freeling the terms of the loan, *viz.*, that authorized partners would execute the Partnership Undertaking and thereby protect Mr. Freeling's interests, and that Barclays would enforce the terms of the loan agreement requiring repayment of the loan by Dewey upon Mr. Freeling's resignation from the firm.  Such affirmative misrepresentation occurred when Barclays tendered the Offering Letter and Schedules A and B thereto (Exh. 1 hereto) that contained both terms, either expressly or impliedly representing thereby that such terms would be enforced.  Alternatively, Barclay failed to disclose, and concealed, the fact that authorized partners would not execute the Partnership Undertaking, and that the terms thereof were meaningless in any event, because Dewey did not intend to pay the amounts owed upon Mr. Freeling's resignation from the firm, and Barclays did not intend to enforce that provisions.

55.     Such misrepresentation by commission or omission was negligent.

56.     Barclays intended for Mr. Freeling to rely on the bank's misrepresentation of the real terms of the loan.

57.     Barclays knew that Mr. Freeling would rely on the bank's misrepresentation in evaluating the deal and agreeing to sign the Offering Letter and Letter of Instruction.

58.     In justifiable reliance on Barclays's misrepresentation, Mr. Freeling signed the Offering Letter and Letter of Instruction.

59.     In the alternative to Count I, assuming that the Court concludes that an agreement was reached, Mr. Freeling was damaged by Barclays's negligence as described hereinabove, in an amount to be proven at trial.

**COUNT THREE**
(Fraudulent Concealment)

60.     Mr. Freeling incorporates by reference Paragraphs 1-43 and 53-54, as though fully stated herein.

61.     Barclays owed Mr. Freeling a duty to disclose the fact that authorized partners would not execute the Partnership Undertaking, and that Dewey had already defaulted under the respective undertakings between the firm and Barclays by continuously failing to repay Barclays material amounts of monies owed to the bank from departed and other partners' capital.

62.     Such information was material to Dewey partners, including Mr. Freeling, as its disclosure would have dissuaded partners, including Mr. Freeling, from signing any loan agreement.

63.     However, Barclays intentionally and fraudulently concealed this information from Mr. Freeling.

64.     Barclays intended for Mr. Freeling to rely on the bank's affirmative representations and failure to make representations, *viz.*, the bank's omissions.

65. Barclays knew that Mr. Freeling would rely on its affirmative representations and omissions in evaluating the deal and agreeing to sign the Offering Letter and Letter of Instruction.

66. In justifiable reliance on Barclays's intentional omissions, Mr. Freeling signed the Offering Letter and Letter of Instruction.

67. In the alternative to Count I, assuming that the Court concludes that an agreement was reached, Mr. Freeling was damaged by Barclays's fraudulent concealment as described hereinabove, in an amount to be proven at trial.

## COUNT FOUR
### (Fraudulent Inducement)

68. Mr. Freeling incorporates by reference Paragraphs 1-43 and 60-67, as though fully stated herein.

69. Such misrepresentations and omissions were knowing and willful, and were committed with an intent to deceive Mr. Freeling, cause him to rely on the misrepresentations and omissions, and induce him to enter into the subject loan agreement.

70. Barclays knew that Mr. Freeling would rely on the bank's intentional misrepresentations and fraudulent omissions in evaluating the deal and agreeing to sign the Offering Letter and Letter of Instruction.

71. In justifiable reliance on Barclays's intentional misrepresentations and fraudulent omissions, Mr. Freeling signed the Offering Letter and Letter of Instruction.

72. In the alternative to Count I, assuming that the Court concludes that an agreement was reached, Mr. Freeling was damaged by Barclays's fraudulent inducement, as described hereinabove, in an amount to be proven at trial.

## COUNT FIVE
(Rescission)

73.     Mr. Freeling incorporates by reference Paragraphs 1-43 and 52-59, as though fully stated herein.

74.     In the alternative to his claim for Negligent Misrepresentation, and assuming that the Court concludes that an agreement was reached, Mr. Freeling prays for rescission of the loan agreement embodied in the Offering Letter, Letter of Instruction and Partnership Undertaking (Exh. 1).

## COUNT SIX
(Rescission)

75.     Mr. Freeling incorporates by reference Paragraphs 1-43 and 60-72, as though fully stated herein.

76.     In the alternative to his claims for Fraudulent Concealment and Fraudulent Inducement, and assuming that the Court concludes that an agreement was reached, Mr. Freeling prays for rescission of the loan agreement embodied in the Offering Letter, Letter of Instruction and Partnership Undertaking (Exh. 1).

WHEREFORE, Plaintiff, Kenneth Freeling, prays for entry of judgment as follows:

A.      On Count One of his Complaint, a Declaratory Judgment that no loan agreement, as embodied in the Offering Letter and Schedules A and B thereto (Exh. 1 hereto) was formed between himself and Barclays, that none exists, and that he is not obligated thereon;

B.      On Count Two, in the alternative, an award of damages in an amount to be proven at trial;

C.      On Count Three, in the alternative, an award of compensatory damages in an amount to be proven at trial, plus punitive damages;

D.      On Count Four, in the alternative, an award of compensatory damages in an amount to be proven at trial, plus punitive damages;

E.      On Count Five, in the alternative, rescission;

F.      On Count Six, in the alternative, rescission;

G.      Mr. Freeling's costs, including reasonable attorneys' fees; and

H.      Such other and further relief as the Court deems just and proper.

Respectfully submitted,


  /s/ Charles S. Fax
Charles S. Fax, Esq.
D.C. Bar No. 198002
Liesel J. Schopler, Esq.
D.C. Bar No. 984298
Rifkin, Weiner, Livingston, Levitan
& Silver, LLC
7979 Old Georgetown Road
Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Cell Phone: (410) 274-1453
Email: cfax@rwlls.com
Attorneys for Plaintiff Kenneth Freeling

DATE:  November 6, 2015

## DEMAND FOR JURY TRIAL

Plaintiff, Kenneth Freeling, demands a trial by jury on all facts, issues and claims that are so triable.


  /s/ Charles S. Fax
Charles S. Fax, Esq.